IN RE CONTRIBUTIONS LIABILITY OF BOWER.

(No. 215946—Decided August 10, 1964.)

*Messrs. Patrick, Patrick & Lehigh* and *Mr. Todd Hoopes,* for appellant.

*Mr. William B. Saxbe,* attorney general, and *Mr. Frederic E. Whitker,* for appellee.

HARTER, J.  This matter comes into this court by way of appeal under Section 4141.26, Revised Code, which provides, in part:

"The validity * * * of any final order * * * may be determined by the Court of Common Pleas of Franklin County, and * * * may be sustained or set aside by the court on an appeal thereto * * *."

It appears that the Bureau of Unemployment Compensation, on December 12, 1960, advised Mrs. Jean V. Bower of Marys-

ville, Ohio, that it had been determined that she was subject to the Ohio Unemployment Compensation Law as of that time, and retroactively to February 1, 1959. Mrs. Bower applied for a review and redetermination on December 1, 1960, and such request was granted. A hearing was then conducted in Columbus on February 8, 1961, at which Mrs. Bower appeared and testified. Some nine months later, a deputy administrator of the Bureau of Unemployment Compensation advised Mrs. Bower that an additional hearing was scheduled for the taking of further testimony at Marysville on October 25, 1961.

At the October 25, 1961, hearing, testimony was taken from Robert Pulley, an employee of the Bureau of Unemployment Compensation, and eleven witnesses produced by Mrs. Bower.

It was not until December 23, 1962, that the Administrator of the Bureau of Unemployment Compensation released his formal opinion as to these two hearings, affirming his original decision of December 12, 1962.

Mrs. Bower gave timely notice of appeal from that decision on January 2, 1963, to this court. The problems arise under Chapter 4141., Revised Code. The sole question on the evidence in the record on appeal is:

Should Jean V. Bower be classified as an "employer" under the definitions contained in Section 4141.01, Revised Code, with respect to numerous individuals who performed consumer surveying on a house-to-house basis?

It is apparently conceded by the Administrator of the Bureau of Unemployment Compensation that Mrs. Bower was at all times an "independent contractor," herself, insofar as the work she was doing in the consumer surveying field for the Nestle Company. Parenthetically, it is a little difficult for me to understand why such concession was made. According to my appraisal of the relationships shown to have existed here, there might well have been a better chance for concluding that Mrs. Bower was a Nestle Company "employee" than that the house-to-house surveyors, or canvassers, were Mrs. Bower's "employees."

After Mrs. Bower began handling this project for the Nestle Company in 1959, she began to use women from her church group to do the actual house-to-house surveying and then she, in turn, used their reports to furnish market research informa-

tion to the Nestle Company. As the projects developed she entered into agreement with numerous members of the original church group and other women to perform consumer surveys, originally at an agreed price per survey, but, later, on an hourly rate.

In practice, Mrs. Bower would make quantities of sample Nestle products available for the surveyors, would give them questionnaire forms, and let them go in crews to the city where the survey was to be made. The surveyors picked their own areas in the city where the house-to-house canvass was to be made. A surveyor would call at a house, tender a sample of the product, explain what she wanted of the housewife called upon, and then leave. At the surveyor's own convenience, she would call back and pick up or complete the answers to the questionnaire. Such call-back might be in one week, two weeks or three weeks. When all questionnaires had been assembled by the canvasser, they would be returned to Mrs. Bower. Mrs. Bower would then make up her market research analysis and turn it in to the Nestle Company. More details as to the fact pattern will be given later in this opinion.

There is a tenency for lawyers and judges to use the terms, "independent contractor," and "employee," rather loosely in considering the problems presented in the field of social security legislation (including the field of workmen's compensation), to give "rules of thumb" as to whether contributions in connection with remuneration are required. The unemployment compensation statutes, Chapter 4141. of the Revised Code, *do not* use these terms in quite the same way that lawyers and judges use them. In passing upon a case challenging the soundness of a ruling by the Administrator of the Bureau of Unemployment Compensation that a given party *is an* "employer" and that contributions *should be* assessed against such party, currently and retroactively as to remuneration received by certain individuals found by the administrator to be, and to have been, such party's "employees", a court should be carefully technical in analyzing the statutes. In my opinion, such court should, however, take a broad approach to the problem so as not to lose sight of the over-all purposes of the social security legislation. I feel these, and a few other background observations, are appropriate here.

Ever since the federal social security legislation became effective in the United States in 1937, there has been a tug-of-war carried on between various governmental agencies, on the one hand, and various different classes of entrepreneurs, on the other, as to whether such entrepreneurs should be required to bear the burden of social security contributions, or be exempt therefrom. It is, of course, vital that all entrepreneurs of a given class be given comparable treatment in this social security field. To illustrate: If one entrepreneur is held not to be subject to the contribution requirement but his competitor *is* required to contribute, the first entrepreneur has an unconscionable advantage over the other in getting, and retaining, business which can be handled profitably. In practice, it becomes a matter of survival in the economic struggle of our competitive society. The making, or not making, of social security contributions in this day of narrowing profit margins may well make the difference between an enterprise's success, or failure.

While this need for equal application of the law is readily apparent, we must bear in mind that the operations of entrepreneurs may, in general, seem quite similar, yet in the details there may be a great variance between them. Administrative agencies and courts are forced, frequently, to indulge in very close refinements. The areas involved are neither black nor white; rather, they are frequently in the grey segment between the extremes, and relatively inconsequential items of evidence may force a decision one way, or the other, to produce a conclusion which, on first consideration, seems to be against the trend of decision.

Another observation is necessary at this point. A court is *bound by the record* submitted to it, and a hearing officer of an administrative agency should also be bound by the evidence *in the record* before him. It is not a question of what the judge, or the hearing officer, may think the facts probably are (based upon his experiences in other cases on different evidence, or based upon his independent knowledge of given relationships). Incredible though it may seem, it is quite possible under our systems of administrative agency fact-finding, and judicial review, that in one case the evidence may require a finding that a given fact pattern produces result X whereas evidence of a

closely comparable nature, yet significantly different in detail, demands result Y.

There is not a great deal of case law in Ohio which is truly helpful in the solution of the problems presented by this appeal. I will mention only two Ohio Supreme Court decisions. The first leading Ohio case in this field is that of *Commercial Motor Freight, Inc.,* v. *Ebright, Treas.* (1944), 143 Ohio St. 127. Paragraph three of the syllabus reads:

"A motor truck operator who, under contract, furnishes his own motor truck, including its fueling and maintenance, to a freight distributing corporation to haul with such motor truck the trailers of such corporation from point to point as directed, and for which he is compensated according to the service rendered, determined either by the mileage covered or by the tonnage hauled, is an independent contractor and, as such, is not within the coverage of the state Unemployment Compensation Act."

This decision was followed by the case of *Behner* v. *Industrial Commission* (1951), 154 Ohio St. 433, wherein paragraphs one and two of the syllabus read:

"1. Whether an individual performing service for another does so as an independent contractor or as an employee is ordinarily a question of fact, the deciding factor being in whom is vested the right of control or superintendence as to the details of the work. If the right to control the manner or means of performing the work is in the person for whom the service is performed, the relationship is that of employer and employee or master and servant; but if the control of the manner or means of performing the work is delegated to the person performing the service, the relationship is that of independent contractor.

"2. A trucker who contracts with an Ohio corporation, engaged in the business of interstate commerce, to transport in interstate commerce without authority in his own right to engage in such transportation a shipment of freight by means of his own truck and equipment, serviced and maintained by him, to a designated destination for a fixed compensation, and who has the right to choose the route to be taken and to control the details of the transportation enterprise, including times and hours of employment, is an 'independent contractor' and not an

'employee,' even though he is obliged to carry and does carry such corporation's Interstate Commerce Commission plates on his equipment during the transportation operation.''

The statutory law is found in Section 4141.01, Revised Code. I quote from 4141.01 (B) in part:

'' 'Employment' means service performed for wages under any contract of hire, written or oral, express or implied * * * .''

Section 4141.01, (B) (1) (c), Revised Code, provides:

''(1) 'Employment' includes:

''* * *

''(c) Services performed by an individual for remuneration unless it is shown to the satisfaction of the administrator that such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact, that such service is outside the usual course of the business for which such service is performed, and that such individual is customarily engaged in an independently established trade, occupation, profession, or business.''

I now need to recite in some detail a few of the facts which give rise to this appeal.

Mrs. Jean V. Bower has, through the years, developed an interesting enterprise of seeing to it that manufacturers of household products and foods may test the acceptability of their products in sample markets through the actual use of them in homes. Mrs. Bower, probably through trial and error processes, developed methods for sampling opinions of housewives in such sample areas. To acquire the raw data from which she made her analyses for the manufacturers, she enlisted women in her church, originally and then, later, other women joined in the crew, to call house-to-house in the city being sampled, leave the product and a questionnaire, and then later to call back. When the raw data from a sampled area was back in Mrs. Bower's possession, she would process it for submission to the manufacturer. The individual crew members were paid when they turned in this data to Mrs. Bower—at one time on a commission, or flat-fee-per-house basis but normally on a $2.50 per hour rate. The totals of the amounts thus paid to crew members were substantial but there was wide variation

between what some received and what others received. Further, there was substantial variation in the amounts of money a given crew-member would receive from one month to the next.

Mrs. Bower made the product samples available for the canvassers, and supplied the questionnaire forms. She did not accompany the crews nor did she specify the area of a city in which the canvassing should be done. The women worked such hours as they, not Mrs. Bower, chose. She had no experience in actually discharging any of the canvassers, *i. e.*, she never tried to "fire" any, but she did tell one unsatisfactory canvasser that she had no further assignments for her.

If nomenclature is helpful, we might say that Mrs. Bower was an "analyst of product appeal" and the crew members were "canvassers" or "surveyors of product appeal." I am not sure that names are helpful but I think these appellations are accurate within reasonable limits.

There was a written contract between Mrs. Bower and each canvasser or surveyor. In it, each canvasser agreed that she was an "independent contractor."

I am fully mindful of the tendency in the field of administrative law not to accept this term, "independent contractor," as used by parties in a written contract, as the easy and complete description of the relationship. The Supreme Court of Ohio has indicated that further inquiry into the facts of practices under the written contract should be explored. I am of the opinion, however, that a court is entitled to assume that the parties to the contract had a right to classify their relationship, one with the other, as at least a starting point in appraising the relationship.

Accordingly, I will tentatively assume that the canvasser was an "independent contractor" with respect to Mrs. Bower. I should next consider whether the evidence shows the contrary, when tested under Section 4141.01 (B) (1) (c), Revised Code. There are three points there: (1) freedom from control over the performance of services; (2) such services being outside the usual course of the business of the potential employer; and (3) the potential employee has an independent, established trade, occupation, profession or business.

For convenience, I will treat of these in inverse order. The canvassers all had independent trades or occupations—not in the

sense of producing cash proceeds—but as housewives or homemakers. Such an occupation is a readily identifiable one. As such homemakers, they were qualified to do their job of canvassing other homemakers for the latters' opinions. Mrs. Bower did not instruct them as to how housewives should talk to other housewives. This, they knew for themselves. I hold that, under the third test, the canvassers were not in Mrs. Bower's employment within the statutory language.

Considering next the test of services outside the usual course of business of the potential employer—Mrs. Bower's "course of business" was that of "analyst of product appeal" (to use my nomenclature). She considered and correlated raw data brought to her and made reports to manufacturers. The canvassers procured the raw data in the field. Let us relate this to a manufacturing analogy. The Jeffrey Manufacturing Company of Columbus manufactures mine machinery. It needs steel plates (among other things) to make its finished products. It buys steel plates, let us say, from Jones & Laughlin Steel Corporation of Pittsburgh. Assume that some plates reach Jeffrey without any rust preventative on them. Jeffrey then "farms out" the job of having the sheets coated with a rust preventative to a local Columbus concern which I will call the X Company, to be done in their own plant. This latter concern, the X Company, is operating as an independent contractor insofar as Jeffrey is concerned. It has a different kind of business from that of Jeffrey. True the sheets of steel are supplied to it by Jeffrey, but the X Company has its own different business—rust prevention treatment. Similarly, Mrs. Bower may be the channel for making samples of a given product available to the canvassers and she may furnish the questionnaire sheets, but each has her own separate business just like Jeffrey and the X Company. So, I hold that, in testing the operations under the second test, the canvassers were not in Mrs. Bower's employment within the second point of the statutory language.

This takes me up the scale to the first test—freedom from control over the *performance* of the services. This is usually regarded as the most significant of the tests in determining whether an independent contractor relationship exists. I have italicized the word "performance." I mean, in so doing, to imply the supervision of the *details* of the doing of the work.

Of course, a contractor is interested in the *end result* and can reject, if not satisfactory, per the contract. This is control of a kind, but it is not control over the details of doing the work—the where, when, how of the actual performance. If the Supreme Court of Ohio could (and did) find that the potential employees in the *Commercial Motor Freight, Inc.,* and *Behner cases, supra,* were not in control of the performance of the service of their truck drivers, I feel it is relatively much easier for me here to find that Mrs. Bower's canvassers were free from control over the performance of the services here involved.

I will not try to enumerate in this opinion all the various items of evidence which I deem significant in arriving at this conclusion. I believe I have described the over-all relationships adequately and with reasonable accuracy. When I do so, and when I come to the conclusions which I have just described on the three tests provided by the statute, I feel compelled to hold that the administrator's order from which this appeal is taken is contrary to the manifest weight of the evidence which was before him, and which is now before me. This means that the administrator's order is not in accordance with law and a reversal of it is required.

*Order reversed.*